No. 97-388

IN THE SUPREME COURT OF THE STATE OF MONTANA

1999 MT 54N

STATE OF MONTANA,

Plaintiff and Respondent,

v.

TOMMY JAMES WILLIAMS,

Defendant and Appellant.

APPEAL FROM: District Court of the Second Judicial District,

In and for the County of Silver Bow,

No

The Honorable James E. Purcell, Judge presiding.


COUNSEL OF RECORD:


For Appellant:


David J. Wing, Walter M. Hennessey, Attorneys at Law, Butte, Montana


For Respondent:


Hon. Joseph P. Mazurek, Attorney General,

Jennifer Anders, Ass't Attorney General, Helena, Montana


Robert M. McCarthy, Silver Bow County Attorney,

Brad Newman, Deputy Silver Bow County Attorney, Butte, Montana


Submitted on Briefs: February 18, 1999


Decided: March 18, 1999


Filed:

No

_____

Clerk

Justice W. William Leaphart delivered the Opinion of the Court.

**¶1. Pursuant to Section I, Paragraph 3(c), Montana Supreme Court 1996 Internal Operating Rules, the following decision shall not be cited as precedent but shall be filed as a public document with the Clerk of the Supreme Court and shall be reported by case title, Supreme Court cause number, and result to the State Reporter Publishing Company and to West Group in the quarterly table of noncitable cases issued by this Court.**

**¶2. Tommy James Williams (Williams) was convicted by a jury of fraudulently obtaining dangerous drugs in violation of § 45-9-104(3), MCA. Williams appeals from his conviction. We affirm the judgment of the District Court.**

ISSUES PRESENTED

**¶3. Williams presents the following issues on appeal:**

**¶4. 1.  Did the District Court err in admitting other crimes evidence in the absence of a notice of intent to introduce such evidence?**

**¶5. 2.  Was Williams denied effective assistance of counsel as guaranteed by the Montana and United States Constitutions?**

BACKGROUND

¶6. On July 28, 1996, a male individual presented a prescription for Percodan, a scheduled drug, at the Osco Pharmacy in Butte, Montana. The pharmacist, Steve DeBarthy, was suspicious for a number of reasons: the prescription purported to have been written by a Dr. James Davis, a Butte psychiatrist whose prescriptions were reportedly being forged in southwest Montana; DeBarthy knew that Dr. Davis was out of town and could not be contacted regarding the validity of the prescription; and DeBarthy had never known Dr. Davis to prescribe Percodan, a narcotic, to his patients.

¶7. DeBarthy and his assistant, Marla Semsak, tried to detain the individual long enough to contact authorities. When DeBarthy informed the individual that it would take several minutes to fill the prescription, the individual fled from the store, leaving the prescription behind. DeBarthy and Semsak observed the person for several minutes while he was in the pharmacy and were able to give a description to the police.

¶8. The investigation was taken over by Officer Jamie Jungers, a Helena police officer assigned to the Missouri River Drug Task Force. Based upon information obtained from Dr. Davis combined with the description given by the Osco employees, Jungers' investigation focused on Williams. Jungers prepared a photographic lineup of six photos, including one of Williams. When presented with the lineup, both DeBarthy and Semsak identified Williams as the person who presented the forged prescription. At trial, Dr. Davis testified that the prescription for Percodan was not written or signed by him.

¶9. Williams testified that he was fishing on the Madison River on the day in question and was at a friend's house in Sheridan, Montana on the afternoon of July 28, 1996. Three witnesses testified that Williams did not leave the friend's residence until 3:30 or 4 p.m. On rebuttal, Officer Jungers testified that one of the alibi witnesses told him, prior to trial, that Williams left his house in Sheridan around 3 p.m. but no later than 3:30 p.m. Osco Pharmacy in Butte is approximately 54 miles from Sheridan and the incident at Osco Pharmacy took place sometime prior to 4:27 p.m.

DISCUSSION

¶10. 1. Did the District Court err in admitting other crimes evidence in the absence of a notice of intent to introduce such evidence?

¶11. Williams contends that the court erred in allowing the State to introduce evidence of prior bad acts or other crimes despite the fact that the State had not given the requisite notice of intent to rely on such evidence. The evidence in question relates to the testimony of Officers Scott and Jungers regarding the presentation of forged prescriptions at a K-Mart pharmacy and other pharmacies in southwest Montana on July 23 or 27, 1996, and on other occasions. On appeal, Williams contends that this evidence constituted "other acts" evidence under Rule 404(b), M.R. Evid., and thus the State was required to follow the notice requirements set forth in State v. Just (1979), 184 Mont. 262, 602 P.2d 957 and State v. Matt (1991), 249 Mont. 136, 813 P.2d 52.

¶12. Williams, however, did not object to the testimony in question on the basis of Rule 404(b), M.R.Evid., or on any other ground. We have long held that alleged errors not brought to the attention of the trial court will not be reviewed for the first time on appeal. *See* §§ 46-20-701(2), 46-20-104, MCA; State v. Lawrence (1997), 285 Mont. 140, 948 P.2d 186. Since the testimony was not objected to at trial, we refuse to address the issue on appeal.

¶13. 2. Was Williams denied effective assistance of counsel as guaranteed by the Montana and United States Constitutions?

¶14. As to Williams' claim that his counsel was ineffective for not objecting to the "other crimes" evidence, we find no merit to that argument. The "other crimes" testimony reads as follows:

Q: Now, you indicated that the reason you were called was to investigate the possibility of a forged prescription being presented; is that correct?

A: Correct.

Q: Dave, were you and Officer Templin involved in an ongoing investigation of a similar incident?

A: Yes, we were.

Q: And when did that incident occur?

A: It occurred the prior afternoon--that would have been on the 27th--at K-Mart pharmacy.

Q: Okay, were any suspects detained in connection with that July 27th matter at K-Mart?

A: We didn't have any detained. We did stop some suspects later, spoke with them briefly, which--

Q: You did not arrest anyone then?

A: No.

**¶15. Rule 404(b) prohibits evidence of other crimes, wrongs, or acts to prove the character of a person in order to show action in conformity therewith. We determine that the testimony regarding other incidents of forged prescriptions was not offered for any of the prohibited purposes described in Rule 404(b), M.R.Evid. The testimony was not used to show that Williams was a suspect in the K-Mart incident or in any other incident. Rather, the testimony was offered to show that there was an on-going investigation of forged prescriptions and that police first became aware that Dr. Davis' prescriptions were being forged shortly before the incident at Osco Pharmacy on July 28th, 1996. This evidence served as the foundation for DeBarthy's**

subsequent testimony that he was on the lookout for Dr. Davis' prescriptions and was thus suspicious of the prescription presented by Williams.

¶16. Since the testimony about other incidents of forged prescriptions was not tied to Williams, it was not "other crimes" evidence within Rule 404(b). Accordingly, Williams' trial counsel was not ineffective for failing to object to the testimony.

¶17. Williams also contends that his counsel was ineffective in that he failed to: (1) have any handwriting analysis done on the prescription presented at Osco; (2) have fingerprint testing of the prescription; (3) adequately determine the credibility of the alibi witnesses; (4) interview the investigating officer to determine why Williams became the focus of the investigation; (5) investigate Leonard Stang's possible connection with the offense; (6) challenge the chain of custody with respect to the forged prescription; (7) challenge the lineup procedure; and (8) request a cautionary instruction that eye-witness testimony was the only evidence tending to connect Williams to the crime.

¶18. We note that Williams has very few citations to the record in support of his list of contentions. This is explained by the fact that most of the claims are not based upon the record before us. There is nothing in this record indicating what counsel did or did not do as far as pre-trial investigation. In particular, the claims of failure to investigate Stang's involvement or failure to interview the investigating officer are matters that are outside this record. The claims related to when, whether and how often counsel interviewed witnesses are outside the record. The same holds true for the claims that counsel failed to obtain handwriting and fingerprint analyses. Although the record shows that no such evidence was offered at trial by the defense, that does not necessarily mean that counsel did not explore the possibility of such testimony. Williams cites to his affidavit, which has an unspecified date in 1998, where he states that despite his requests, defense counsel refused to have fingerprint or handwriting analysis performed on the document or to investigate Stang's alleged involvement. This matter is before the court on appeal from the May 19, 1997 Judgment and Order of Commitment. The 1998 affidavit appended to his appeal brief is not part of the District Court record and cannot be considered by this Court in this direct appeal. When ineffective assistance of counsel claims require consideration of factual matters outside the record, they are inappropriate in the context of a direct appeal. In re Petition of Evans (1991), 250 Mont. 172, 819 P.2d 156. We find no support in this record for these contentions and thus we reject them.

No

**¶19. As to the contention that counsel was ineffective for not objecting to the chain of custody, again there is nothing in this record to support the claim. Officer Jungers testified that he removed the prescription from the evidence locker in August, 1996 and had it in his possession, in his case notebook, until the time of trial in March, 1997. Williams contends that counsel should have questioned whether the notebook was sufficiently secure to protect the document from outside handling or alteration. Officer Jungers' testimony as to the chain of custody was as follows:**

Q: And do you know where that document has been since August 20th, 1996?

A: Right here in my case folder, which is kept in my locked office up in Helena.

Q: Has that document been entrusted to your care, custody and control from August 20th till this morning?

A: That's correct.

Q: And did you personally give that document to me for use at this trial?

A: Yes.

Q: Detective, has that document been materially altered or changed at any time since it's been in your custody?

A: No, I've put it into this little cellophane folder type thing and placed it into my casebook.

No

Q: So the folder itself is yours?

A: That's correct.

Q: The document itself, you don't notice any changes or alterations?

A: There has been none.

Q: Does it substan---Is it in substantially the same condition now as it was when you first took it in your custody?

A: Yes, it is.

Q: And you took that from the custody of the Butte evidence room; is that correct?

A: That's correct.

¶20. There is nothing in this record that would indicate that there would have been any merit to an objection to the chain of custody. Thus Williams cannot, on the record before us, establish any prejudice from this alleged omission.

¶21. Without citing to any authority, Williams argues that counsel was ineffective for not challenging the out-of-court identification procedure whereby Semsak was shown a single photo of Williams and asked whether that was the individual who attempted to pass the fraudulent prescription.[1] Given the lack of any legal authority for Williams' contention, the fact that both eye-witnesses (Semsak and DeBarthy), when

presented with a photographic lineup of six individuals, picked Williams without hesitation, and the fact that DeBarthy positively identified Williams at trial as the man who presented the forged prescription at the Osco Pharmacy, we find no merit to Williams' contention.

¶22. Finally, Williams argues that counsel was ineffective for failing to request an instruction advising the jury that the eye-witness testimony of DeBarthy and Semsak should be viewed with caution since it was the only evidence tending to connect Williams with the forged prescription. Williams' sole authority for this contention is State v. Strain (1980), 190 Mont. 44, 52, 618 P.2d 331, 336, where, in discussing the nature of the evidence of theft against Strain, we stated: "Although a special cautionary instruction may be required where identification testimony is the only evidence tending to connect a defendant with commission of the act charged, there is other evidence." This statement is not only dicta, it is phrased in the permissive. As such, it is not authority for determining that counsel who neglects to request such an instruction is ineffective as a matter of law.

¶23. The judgment of the District Court is affirmed.


/S/ W. WILLIAM LEAPHART


We concur:


/S/ J. A. TURNAGE

/S/ KARLA M. GRAY

/S/ WILLIAM E. HUNT, SR.

/S/ JIM REGNIER

1. [1] Williams references a police report dated August 19, 1996, purportedly appended to his brief as Document

No

#3. Document #3 in his appendix, however, is not a police report. It is an affidavit from Williams unrelated to the issue of photo identification. The only police report in the appendix or in the record, is a report dated October 2, 1996 pertaining to the six-person photo line-up.